UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| LACEY WELD, | ) |  |
|---|---|---|
| Petitioner, | ) |  |
| v. | ) | No: 3:16-CV-433-TAV |
| UNITED STATES OF AMERICA, | ) |  |
| Respondent. | ) |  |

## MEMORANDUM OPINION

This is a *pro se* prisoner's motion to vacate, set aside, or correct a sentence under 28 U.S.C. § 2255 [No. 3:16-cv-433-TAV, Doc. 1]. Respondent responded in opposition [*Id.*, Doc. 5]. For the following reasons, the § 2255 motion [*Id.*, Doc. 1] will be denied and this action will be dismissed.

## I. BACKGROUND

From the summer of 2010 through early February 2013, Petitioner participated in a large-scale methamphetamine-manufacturing conspiracy [No. 3:13-cr-84-TAV-CCS-4, Doc. 76.]. Specifically, she purchased at least 150 grams of pseudoephedrine, an ingredient of methamphetamine, and assisted with the hazardous process of "cooking" methamphetamine [*Id.*, Docs. 76, 202]. Petitioner told investigators that she was present for at least a dozen "cooks" by codefendant Charles Craig Rhodes [*Id.*, Doc. 231]. During the conspiracy, Petitioner became pregnant and ultimately gave birth to a child who exhibited signs of opiate and amphetamine exposure and drug-withdrawal symptoms [*Id.*].

In November 2013, Petitioner pleaded guilty, pursuant to a written plea agreement, to conspiring to manufacture at least 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A) [*Id.*, Docs. 76, 256]. She agreed she was subject to a ten-year statutory mandatory minimum sentence and that the Court had discretion to impose any sentence up to the statutory maximum of life imprisonment [*Id.*]. She also acknowledged that her sentence would be "based upon the entire scope of [her] criminal conduct, [her] criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and . . . 18 U.S.C. § 3553" [*Id.*]. As part of her plea agreement, Petitioner also waived her right to appeal, reserving only the right to appeal a sentence above the guidelines range "determined by" the Court [*Id.*, Doc. 76].

Based on the drug quantity stipulated as part of the guilty plea, the Presentence Investigative Report (PSR) listed Petitioner's base offense level as 32 [*Id.*, Doc. 112]. The PSR applied a three-level enhancement under U.S.S.G. § 2D1.1(b)(13)(C)(ii)(I), on the basis that Petitioner's offense involved the manufacture of methamphetamine and created a substantial risk of harm to human life [*Id.*]. Specifically, the probation officer referred to evidence that Petitioner had manufactured—and smoked—methamphetamine while in the late stages of pregnancy [*Id.*]. A three-level reduction for acceptance of responsibility yielded a total offense level of 32 and, in light of Petitioner's criminal history category of IV, a guidelines range of 168 to 210 months' imprisonment [*Id.*].

Petitioner objected to the three-level enhancement, claiming that her proximity to an operational methamphetamine laboratory while pregnant and her methamphetamine use were "irrelevant" to a determination of whether the offense of conviction created a substantial risk of harm to human life [*Id.*, Doc. 125]. Petitioner also argued that this enhancement was inappropriate because an unborn fetus is not specifically contemplated in § 2D1.1(b)(13) as constituting "human life" [*Id.*]. Subsequently, the United States requested a six-level enhancement under U.S.S.G. § 2D1.1(b)(13)(D)—regarding substantial risk of harm to the life of a minor—instead of the three-level enhancement objected to by Petitioner—regarding human life generally [*Id.*, Doc. 172]. In response to Petitioner's suggestion that the enhancement was inapplicable if the risk of harm related to an unborn fetus, the United States argued that Petitioner not only created a substantial risk of harm to her child in utero, but also created a substantial risk of harm to the child after birth, as evidenced by the severe effects of drug dependence that he displayed once born [*Id.*].

The PSR was revised to contain the six-level § 2D1.1(b)(13)(D) enhancement instead of the three-level § 2D1.1(b)(13)(C)(ii)(I) enhancement [*Id.*, Doc. 202]. The corresponding total offense level was thus 35 and yielded an advisory guidelines range of 235 to 293 months' imprisonment [*Id.*]. Petitioner again objected to any "risk of harm" enhancement [*Id.*, Docs. 208, 214, 217].

During the sentencing hearing, the United States presented testimony from two witnesses and, among other evidence, a 40-minute video recording from a methamphetamine laboratory on May 10, 2012 [*Id.*, Doc. 231]. The video depicted two methamphetamine "cooks" occurring simultaneously; Petitioner was present and actively participating in the process, although a codefendant appeared to be the primary person manufacturing methamphetamine on that date [*Id.*]. In the video, Petitioner can be seen chopping and grinding pseudoephedrine pills, stirring various components, and smoking the finished methamphetamine [*Id.*]. During the cooking process Petitioner held her shirt over her nose numerous times, and the video also depicted codefendants burning trash and byproducts from the methamphetamine manufacturing process [*Id.*].

Petitioner was visibly pregnant in the video recording—she gave birth twenty-six days after the video was taken [*Id.*].

To explain the significance of the activities shown on the video, the United States called Tennessee Bureau of Investigation Special Agent Matthew Thompson; for the previous fourteen years, he had obtained annual certifications from the Tennessee Methamphetamine Task Force qualifying him to safely dismantle methamphetamine laboratories and supervise others doing so [*Id.*]. Agent Thompson estimated that, between his own investigations and assisting others, he had been present in approximately 400 to 500 methamphetamine laboratories. He later explained that, because of the inherently hazardous health conditions posed by methamphetamine laboratories, investigating agents

wear full-body chemical suits, gloves, boots, and self-contained breathing apparatuses when entering such laboratories [*Id.*].

Agent Thompson testified that the type of manufacturing process depicted in the video was the "anhydrous ammonia method" or "ephedrine reduction method" [*Id.*]. Specifically, the coconspirators combined muriatic acid, acetone, anhydrous ammonia, lithium, and hydrogen chloride, then added a heat source, "basically boiling a flammable liquid" and thereby creating a "huge [risk of] fire and explosion" [*Id.*]. Agent Thompson explained that an explosion could occur if any water—or even human sweat—touched the anhydrous ammonia [*Id.*]. Moreover, he testified that anhydrous ammonia's strong odors can cause dizziness and respiratory problems, and holding fabric over one's nose would not provide protection from its odors and vapors [*Id.*]. Additionally, the coconspirators burned various items associated with the methamphetamine manufacturing process, which he stated could have caused an explosion or further disseminated toxic fumes [*Id.*]. Agent Thompson also noted that the methamphetamine laboratory shown in the video was in a building just fifteen feet away from railroad tracks, so close that the building shook whenever a train passed, and, in his opinion, increasing the risk of explosion and the possibility of harm to anyone on a passing train [*Id.*].

The other witness for the United States—Lynnie Vaughn, a caseworker with the Tennessee Department of Children's Services—testified that Petitioner gave birth to a drug-dependent son on June 5, 2012, less than one month after the cook depicted in the video [*Id.*]. At the time of birth, Petitioner tested positive for oxycodone and

amphetamines; three days later, she tested positive for methamphetamine, oxycodone, amphetamine, benzodiazepines, opiates, and marijuana [*Id.*]. The child's meconium tested positive for methamphetamine, and he had to remain in the neonatal intensive-care unit for nearly seven weeks because of medical complications stemming from drug withdrawal [*Id.*]. Petitioner herself admitted the severity of her son's drug dependence, acknowledging that "he could have died" because of her actions [*Id.*].

Based on Vaughn's personal observations of the child in the hospital and her review of his medical records, she testified that Petitioner's son experienced withdrawal symptoms including uncontrollable whole-body tremors [*Id.*]. On most days, the baby was "jittery" when awake [*Id.*]. He vomited when attempting to feed [*Id.*]. In the end, he received morphine for thirty-nine consecutive days to help control his withdrawal symptoms; earlier attempts to wean him off the morphine were unsuccessful [*Id.*]. He also received phenobarbital for twenty-four days [*Id.*].

Medical professionals often use Finnegan scores to quantity the symptoms of drug dependence in infants; the higher the score, the more significant the withdrawal symptoms the child is experiencing [*Id.*]. Vaughn testified that she had worked on approximately 50 cases involving drug-dependent infants and that, until this case, the worst Finnegan score she had ever seen was 12; Petitioner's son had Finnegan scores of 13, 14, 15, and even 16 [*Id.*]. Based on the extent of drug dependence experienced by Petitioner's son, the state courts ultimately found that Petitioner had committed "severe abuse" against her son [*Id.*].

6

After hearing the evidence and the parties' arguments, as well as Petitioner's allocution, the Court applied the six-level enhancement in USSG 2D1.1(b)(14)(D), which applies when "the offense involved the manufacture of amphetamine or methamphetamine and the offense created a substantial risk of harm to the life of a minor" [*Id.*]. The Court explicitly considered the factors listed in U.S.S.G. § 2D1.1, comment. (n.18(B)), and found that three of those factors weighed in favor of applying the enhancement, with the final factor being neutral [*Id.*]. Noting that "neither party dispute[d] . . . that [Petitioner's] child was a minor after birth," the Court found that Petitioner's "offense conduct . . . not only created a substantial risk of harm, but did, in fact, harm the life of that minor in three distinct ways" [*Id.*]. First, Petitioner's participation in the manufacture of methamphetamine on May 10, 2012, while eight months pregnant, created a substantial risk of harm "to the minor child produced by the pregnancy in that there was exposure to dangerous chemicals and fumes as well as the potential at that time for . . . [an] explosion" [*Id.*]. The presence of fumes was evident on the video because Petitioner covered her nose with her shirt, and Agent Thompson had testified about the risk of explosion inherent in the method of manufacturing methamphetamine depicted in the video. Second, Petitioner's use of methamphetamine on May 10, 2012, as shown on the video, created a substantial risk of harm to the life of her child, as manifested after the child's birth less than one month later [*Id.*]. Third, Petitioner's use of methamphetamine at other times during pregnancy also created a substantial risk of harm to the life of her child, and that risk similarly manifested after the child's birth [*Id.*]. As for Petitioner's claim that her methamphetamine

7

use was not relevant conduct, the Court found that she sampled the finished product as part of the manufacturing process on May 10, 2012, and that her use of methamphetamine at other times was one of the purposes of the conspiracy to manufacture methamphetamine [*Id.*]. The Court thus overruled Petitioner's objection to the revised presentence report and found that the applicable guidelines range was 235 to 293 months' imprisonment [*Id.*].

The United States filed a motion for a three-level downward departure under U.S.S.G. § 5K1.1 based on Petitioner's substantial assistance, recommending a sentence as low as 168 months' imprisonment [*Id.*, Doc. 207]. Petitioner had previously urged the Court to impose a sentence of no more than 60 months' imprisonment, but conceded that she remained subject to a ten-year mandatory minimum [*Id.*, Docs. 161, 231]. After considering the 18 U.S.C. § 3553(a) factors, and based on the Court's own evaluation of the extent of Petitioner's cooperation, the Court departed downward by four levels and imposed a sentence of 151 months' imprisonment, well below the guidelines range it had deemed applicable [*Id.*, Docs. 233, 226].

Petitioner appealed and disputed whether the six-level enhancement was constitutional as applied to her; in her view, the enhancement "imping[ed] on her fundamental right to bear children" and constituted "gender-based discrimination." Brief of Appellant at 24–38, *United States v. Weld*, 2014 WL 6851368 (6th Cir. 2015) (No. 14-5894). The United States moved to dismiss the appeal as barred by the appeal-waiver provision in the plea agreement, and, after full briefing, the Sixth Circuit granted that motion and dismissed the appeal. *United States v. Weld*, 619 Fed. App'x 512, 513 (6th Cir.

2015). Petitioner unsuccessfully sought further review; the Supreme Court denied her petition for certiorari on April 19, 2016. (No. 3:13-cr-84-TAC-CCS-4, Doc. 269).

Petitioner has now filed a timely motion pursuant to 28 U.S.C. § 2255.

## II. ANALYSIS

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255, "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. However, a defendant may waive any right, even a constitutional right, if she does so knowingly and voluntarily, and a waiver provision in a plea agreement is enforceable. *In re Acosta*, 480 F.3d 421, 422 (6th Cir. 2007); *accord Davila v. United States*, 258 F.3d 448, 450–52 (6th Cir. 2001); *Watson v. United States*, 165 F.3d 486, 489 (6th Cir. 1999). Petitioner, in her plea agreement, explicitly waived the right to file a § 2255 motion, except for claims of ineffective assistance of counsel or prosecutorial misconduct [No. 3:13-cr-84-TAV-CCS-4, Doc. 76]. Moreover, this waiver is enforceable: the Sixth Circuit stated that even if the guideline range in this case was calculated incorrectly, that would be insufficient grounds to void the waiver. *Weld*, 619 Fed. App'x at 513.

Petitioner has asserted three grounds for relief: two based on ineffective assistance of counsel and one alleging a due process violation. The Court will address each argument in turn.

9

### A. Ineffective Assistance of Counsel

#### 1. Failure by Counsel to Raise Constitutional Issues with Petitioner's Sentencing Calculation

Petitioner argues that her counsel was ineffective during her sentencing hearing for not arguing that a sentencing enhancement used by the Court to calculate her guideline range violated her rights under the due process clause of the Fourteenth Amendment [No. 3:16-cv-433-TAV, Doc. 1]. However, Petitioner does not allege or set forth any facts from which the Court could plausibly infer that counsel was ineffective.

A petitioner alleging ineffective assistance of counsel must satisfy both prongs of the test set fort in *Strickland v. Washington*, 466 U.S. 668, 687 (1987). First, Petitioner must establish that her counsel's performance was deficient— making errors so serious as to violate the Sixth Amendment— and second, that her counsel's performance prejudiced her defense, depriving Petitioner of a fair trial. *Id.* To establish that her counsel's performance was deficient, Petitioner must overcome the "highly deferential" standard of objective reasonableness, which "includes a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Mason v. Michell*, 320 F.3d 604, 616–17 (6th Cir. 2003).

Petitioner fails this first prong because she cannot demonstrate that her counsel's performance was deficient through his failure to raise novel issues of constitutional law. Counsel cannot generally be considered ineffective because they do not argue innovative interpretations of the law. *Thompson v. Warden, Belmont Correctional Institution*, 598 F.3d 281, 288 (6th Cir. 2010) ("[C]ounsel is not ineffective for failing to predict the

development of the law"); *Alcorn v. Smith*, 781 F.2d 58, 62 (6th Cir. 1986) ("[N]onegregious errors such as failure to perceive or anticipate a change in the law . . . generally cannot be considered ineffective assistance of counsel").

The argument that Petitioner faults her counsel for not making—that the § 2D1.1(b)(13)(D) enhancement is unconstitutional as applied to pregnant women—has not been addressed by any circuit court, much less the Sixth Circuit. *Weld*, 619 Fed. App'x at 513 ("[Petitioner] concedes that no court of appeals has held that § 2D1.1(b)(13)(D) is unconstitutional as applied to a pregnant woman. She also concedes that her constitutional claims are matters of first impression for our court . . . That means that any error here was not plain."). Any such argument that Petitioner's counsel could have raised would therefore have been of first impression and thus necessarily novel. Failing to do so does not demonstrate that counsel conducted himself outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Moreover, the Court observes that Petitioner's counsel did object numerous times, both in writing and at the sentencing hearing, to the application of § 2D1.1(b)(13)(D), which further indicates that counsel's advocacy fell within the permissible range of reasonable professional assistance [No. 3:13-cr-84-TAC-CCS-4, Docs. 125, 190, 208, 231].

Because Petitioner fails to establish that her counsel's performance was deficient, her first ground for relief will be denied.

### 2. Failure by Counsel to Argue Sentence Disparity Between Petitioner and Her Codefendants

Petitioner's counsel was likewise not ineffective for failing to argue that an inappropriate disparity existed between her sentence and that of her codefendants. 18 U.S.C. § 3553(a)(6) instructs court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." However, "[t]he objective of this statute is not to eliminate sentence disparities between defendants of the same case who have different criminal records; rather, the objective is to eliminate unwarranted disparities nationwide." *United States v. LaSalle*, 948 F.2d, 215, 218 (6th Cir. 1991) (internal citations and quotations omitted). Although sentencing courts may consider the sentences of codefendants, this is not required by statute and is within the court's discretion. *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007).

As an initial matter, Petitioner has not presented any evidence to demonstrate that her sentence differed substantially from those given to similarly-situated defendants nationwide or even as compared to her codefendants. Moreover, this Court varied downward in Petitioner's case, sentencing her well below the guideline range it determined appropriate. *See United States v. Shrake*, 515 F.3d 743, 748 (7th Cir. 2008) (stating that it is "pointless" for a defendant who is sentenced within—and in this case, below—the guideline range to allege a sentencing disparity).

Further, and as stated above, defense counsel objected several times to this Court's use of § 2D1.1(b)(13)(D) [No. 3:13-cr-84-TAC-CCS-4, Docs. 125, 190, 208, 231].

Although he did not raise this particular argument, he did assert several others. Although counsel was ultimately unsuccessful in his objections to Petitioner's guideline range, his failure to raise a sentencing disparity argument does not make his representation constitutionally inadequate. Counsel's advocacy did not fall and below the standard of objective reasonableness.

B. **Due Process and Ex Post Facto Violations**

Petitioner finally alleges due process and ex post facto violations for the "imposition of criminal sanctions and enhancement for a non-existent crime"—here, her use of methamphetamines [Case No. 3:16-cv-433, Doc. 1]. This argument must fail.

Petitioner pleaded guilty to conspiracy to manufacture fifty grams or more of methamphetamine, a schedule II controlled substance [No. 3:13-cr-84-TAC-CCS-4, Doc. 88]. Under the relevant statutes, the Court was authorized to impose a sentence anywhere from ten years' to life imprisonment. *See* 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). When determining an appropriate sentence, the Court was able to, and did, consider multiple factors, including her guideline range and the § 3553(a) factors. *See United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013) ("When all is said and done, a sentencing judge's inquiry is broad in scope, and it is largely unlimited either as to the kind of information he may consider, or the source from which it may come"); *Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) (noting that judges may "take[] into consideration various factors relating both to offense and offender" when imposing sentences within statutory limits).

Further, Petitioner had notice that the Court would do this. Her signed plea agreement states "The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, *and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553*" [No. 3:13-cr-84-TAC-CCS-4, Doc. 76] (emphasis added). In its discussion of Petitioner's guideline range, the Court noted that Petitioner had sampled finished methamphetamine product as part of the manufacturing process on May 10, 2012, and that her use of methamphetamine at other times was one of the purposes her participation in the conspiracy [*Id.*, Doc. 233]. The Court determined that this was relevant conduct that could be considered when determining the applicability of § 2D1.1(b)(13)(D) [*Id.*].

The Court therefore did not, as Petitioner alleges, impose criminal sanctions based on her use of methamphetamine. Rather, it considered her use as relevant conduct for the purpose of determining the appropriate guideline range, and as part of her history and characteristics, which must be considered under § 3553(a). In sum, the Court did not violate Petitioner's due-process rights by considering her past drug use in fashioning a sentence that was sufficient but not greater than necessary to comply with the purposes discussed in 18 U.S.C. § 3553.

Finally, there is no ex post facto violation in this case. The Ex Post Facto Clause is violated where a defendant is sentenced under a higher guideline range than that which

would have been calculated at the time of the offense. *Peugh v. United States*, 569 U.S. 530, 539 (2013). Petitioner has not alleged this situation, nor was it the case here.

## III. CONCLUSION

The Court finds that Petitioner is not entitled to relief pursuant to 28 U.S.C. § 2255, and her motion to vacate, set aside or correct sentence [No. 3:16-cv-433-TAV, Doc. 1] will be **DENIED** and this action will be **DISMISSED**. The Court will **CERTIFY** that any appeal from this action would not be taken in good faith and would be totally frivolous. Therefore, this Court will **DENY** Petitioner leave to proceed *in forma pauperis* on appeal. *See* Fed. R. App. P. 24. Moreover, because Petitioner has not made a substantial showing of the denial of a constitutional right and jurists of reason would not dispute the above conclusions, *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), a certificate of appealability **SHALL NOT ISSUE.** A Judgment will enter **DENYING** the Motion [No. 3:16-cv-433-TAV, Doc. 1].

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE